

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Newport News Division**

ANAND SHETTY,

      Plaintiff,

v.                                  Case No. 4:12cv158

HAMPTON UNIVERSITY,

      Defendant.

## REPORT AND RECOMMENDATION

    This matter was referred for disposition to the undersigned United States Magistrate Judge ("undersigned") pursuant to a July 9, 2013 Referral Order from the Chief United States District Judge, ECF No. 23, in accordance with 28 U.S.C. § 636(b)(1)(B) and (C), Federal Rule of Civil Procedure 72(b), and E.D. Va. Local Civil Rule 72. Plaintiff Anand Shetty ("Dr. Shetty") brings this complaint against his previous employer, Defendant Hampton University ("the University" or "the employer"), and alleges employment discrimination based on his national origin and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII"), and violations of his federal rights under the Family and Medical Leave Act, 29 U.S.C. § 2600 *et seq.* ("FMLA"). The University filed a motion for summary judgment, ECF No. 19 ("the Motion"), to which Dr. Shetty filed an opposition, ECF No. 22. On July 17, 2013, the undersigned held a hearing on the Motion for Summary Judgment and on the University's Motion for Leave to file an Amended Answer, ECF No. 17, which Dr. Shetty also opposes, ECF No. 18. The undersigned has fully considered the briefs filed in support of, and in opposition to, each motion, and the oral argument presented during the hearing. For the reasons discussed more fully below, the undersigned

**RECOMMENDS** that the University's Motion for Summary Judgment, ECF No. 19, be **GRANTED**, and that the University's Motion for Leave to File an Amended Answer, ECF No. 17, be **DISMISSED** as moot.

## I. UNDISPUTED MATERIAL FACTS[1]

Dr. Shetty is of East Indian national origin.  ECF Nos. 4, ¶ 8, 16 ¶ 1; 20 ¶ 1.  He holds a doctorate degree in physical education specializing in kinesiology, biomechanics, and exercise physiology.  ECF Nos. 16 ¶ 12; 20 ¶ 3 (citing Dr. Shetty's Deposition I at 10-11 (May 13, 2013) (hereinafter "Shetty Dep. I")).  In 1998, Dr. Shetty was hired by the University as a professor in the Physical Therapy Department ("the Department").  ECF Nos. 16 ¶ 2; 20 ¶ 8.  He was granted tenure at the University in 2004.  ECF No. 16 ¶ 3; Am. Compl. ¶ 15.  For reasons not germane to this matter, the Department was "temporarily closed" and stopped accepting new students on or around 2005, but was still accredited by the Commission on Accreditation and Physical Therapy Education ("CAPTE") and therefore continued to teach and graduate students already enrolled in the Department until Spring of 2008, when the last class graduated.  ECF Nos. 16 ¶ 5; 20 ¶ 11; Shetty Dep. I at 41-44.  The Department started accepting new students again in the Fall of 2009.  Shetty Dep I. at 44.  By this point, in January of 2009, the University hired Dr. Bernadette Williams, an African-American woman, as the Chair of the Department.  ECF Nos. 16 ¶ 5; 20 ¶ 20.  Dr. Shetty's allegations are based, in large part, on interactions with Dr. Williams, and the timeline of events, as asserted in the briefs and Amended Complaint, while less than clear, can be chronologically summarized as follows.

---

[1] In accordance with Local Civil Rule 56(B), both parties listed in their briefs what they believed to be the material facts of this case.  The University listed forty-seven (47) "undisputed facts," ECF No. 16 at 2-7, and Dr. Shetty listed eighty-five (85) "material facts," ECF No. 20 at 2-17.  Similar to the discussion that occurred at the hearing on July 17, 2013, on summary judgment, the Court is only interested in the "material" facts, and not minor facts that are not directly relevant to the elements of the claims asserted in Plaintiff's Amended Complaint.  *See* Transcript at 43-44 (July 17, 2013) (hereinafter "Tr.").  After considering the briefs and the oral argument of counsel, the undersigned finds that there are no material facts in dispute, and accordingly summarizes those material facts in this section.

Dr. Shetty taught Research I and II, Kinesiology, and Anatomy in the Department for the majority of his employment at the University before Dr. Williams was hired. ECF Nos. 4 ¶¶ 38-39; 20 ¶¶ 43-44; Williams Dep. 114-16. In late summer or fall of 2009, Dr. Williams instructed Dr. Shetty to order the cadavers for his Anatomy course.[2] Around the same time, in front of other faculty members, Dr. Williams accused Dr. Shetty of failing to attend a mandatory event, Williams Dep. at 37-46, but his presence at the event was later confirmed by other faculty members. On September 30, 2009, Dr. Williams denied Dr. Shetty's request to attend the physical therapy recruitment exposition at James Madison University ("JMU"). ECF Nos. 16 ¶ 8; 20 ¶ 35. Sometime between September 20, 2009 and October 19, 2009, Dr. Shetty met with Provost, Dr. Pamela Hammond, to complain of Dr. Williams' allegation that he was not at the mandatory event, and of her denial of his travel request to JMU. Hammond Dep. at 58-59. Subsequently, on October 19, 2009, as a follow-up to Dr. Shetty's meeting with Provost Hammond, Dr. Williams and Provost Hammond exchanged emails, wherein Dr. Williams vaguely stated, "Dr. Shetty appears to be gathering information and documentation in preparation for something." Williams Dep. Ex. 15; ECF No. 16, Ex. 8 at 108-109.

In February of 2010, Dr. Shetty met with Mr. Michael Druitt, Assistant to the Dean of the School of Science, to complain of Dr. Williams' actions, which he claimed constituted discrimination. ECF Nos. 16 ¶ 9; 20 ¶ 41. Dr. Shetty experienced "a reprieve" from the alleged discrimination in the months immediately after this meeting. *Id.* In May of 2010, upon Dr. Shetty's request to Provost Dr. Hammond, his employment contract was changed from twelve

---

[2] The reason or motive behind Dr. Williams' request is disputed but not material to the issue: Dr. Williams testified that it was because the administrative assistant who typically ordered the cadavers was out on administrative leave from June until August of that year, Williams Dep. at 24, while Dr. Shetty insisted it was a demeaning administrative task that Dr. Williams imposed upon him even after the administrative assistant returned. ECF No. 20 ¶¶ 26-27.

(12) months to nine (9) months, meaning he would not teach during the summer months and would earn decreased pay as a result. ECF No. 16 ¶ 10; Shetty Dep. II at 50-51; Hammond Dep. at 52. In the fall of 2010, during a presentation to CAPTE officials, Dr. Williams summarized student evaluation ratings of Dr. Shetty as 4.35 out of 5 from 1998 to 2003, and 3.5 out of 5 from 2003 to present, while also highlighting positive feedback from student course evaluation commentary and from peer review. ECF No. 20 ¶ 42 (citing Hammond Dep. at 20; Williams Dep. at 18, 120-22). Around the same period of time, Dr. Williams removed Dr. Shetty first from teaching Anatomy, and later from teaching Research I and II and Kinesiology, and attempted to reassign him to classes offered by the Physical Education Department instead. ECF No. 16 ¶ 13; 20 ¶¶43-45. Subsequently, during a review of records for an upcoming CAPTE visit, Dr. Williams wrote a letter to the Dean of the School of Science, Dr. Dixon, about date discrepancies on Dr. Shetty's *curriculum vitae* ("CV"), which she described as "falsification of official documents," and recommended Dr. Shetty's immediate termination. ECF No. 20 ¶¶47-49, Ex. 23. Neither Dean Dixon nor Provost Hammond acted upon this recommendation.

In January of 2011, Dr. Williams denied Dr. Shetty a stipend for travel to Atlanta to attend and present at an American Heart Association convention on behalf of the University. ECF Nos. 16 ¶ 15; 20 ¶ 50. This denial was subsequently reversed by Dean Dixon. *Id.* In February of 2011, Dr. Williams evaluated Dr. Shetty's performance as a "49," which was in the "poor" category, and much lower than previous evaluations he had received since 1998. ECF Nos. 16 ¶ 16; 20 ¶ 53. Under the University's faculty handbook, this evaluation score triggered a process called post-tenure review ("PTR"). ECF Nos. 16 ¶ 18; 20 ¶ 53. By letter dated March 3, 2011, Dr. Shetty filed a formal complaint with Dean Dixon regarding his performance evaluation and alleged discrimination by Dr. Williams. ECF Nos. 16 ¶ 17; 20 Ex. 10. Dean Dixon met

with Dr. Shetty and Dr. Williams on March 17, 2011 to address the allegations in Dr. Shetty's letter. ECF No. 16 Ex. 7. By letter dated March 21, 2011, Dean Dixon stated that Dr. Williams was firm in her position that Dr. Shetty had been fairly evaluated, and concluded that the meeting "did not result in the resolution of the allegations." *Id.* Dr. Shetty was advised of subsequent options, including a meeting with Provost Hammond and the filing of a formal grievance. *Id.* Shortly thereafter, on April 29, 2011, Dr. Shetty filed a charge of discrimination with the Virginia Council on Human Rights and the federal Equal Employment Opportunity Commission ("EEOC"). ECF No. 1 Ex. 1 at 3-4.

Effective June 30, 2011, both Dr. Williams and Dean Dixon resigned their positions and were not employed at the University during the 2011-2012 academic year. ECF No. 16 ¶¶ 22-23. In August of 2011, in accordance with the PTR process, Dr. Shetty submitted a "dossier" to the office of the Provost for consideration by the PTR committee, which was comprised of five faculty members. ECF Nos. 16 ¶¶ 25, 27; 20 ¶ 70. The PTR committee met on September 8, 13, and 20 of 2011, and initially recommended that the PTR process for Dr. Shetty terminate because Dr. Williams and Dean Dixon had not provided the justification for the low evaluation score and there was no evidence of student complaints. ECF Nos. 16 Ex. 17 at 2 (citing Ex. 16 at 3); 20 ¶ 76.   After review of the PTR committee's recommendation, Provost Hammond provided the documentation to the PTR committee of Dr. Williams' rationale for the low evaluation score and student complaints. ECF Nos. 16 ¶ 29, Ex. 18, 19; 20 ¶ 72. In November of 2011, the PTR committee reconvened, voted to rescind the earlier recommendation of termination of the process, and instead recommended that Dr. Shetty develop a Performance Improvement Plan ("PIP"), which was subsequently approved by the Provost Hammond. ECF Nos. 16 ¶¶ 31-32, Ex. 20; 20 ¶ 77.

On December 2, 2011, Dr. Shetty filed a request for FMLA leave with the University to travel to India for medical treatment. ECF Nos. 16 Ex. 5; 20 ¶ 79. This request was initially approved by the new Department Chair, Dr. Rainey. ECF Nos. 16 Ex. 5 at 2; 20 ¶ 81. However, after the University received certification from Dr. Shetty's healthcare provider, the University's Director of Human Resources, Ms. Rikki Thomas, by letter dated December 9, 2011, informed Dr. Shetty that he was not eligible for FMLA leave because the certification did "not support the type of leave requested." *Id.* at 7. At this point, Dr. Shetty had already left for India, and therefore his leave was unauthorized. ECF Nos. 16 ¶ 34; 20 ¶ 85; Shetty Dep. II at 71. When Dr. Shetty returned in January of 2012, he lost no benefits and the University took no action of any kind against him. ECF No. 16 ¶ 37; Shetty Dep. II at 70.

Subsequently, Dr. Shetty met with Provost Hammond, and because he thought the PTR and PIP process was a "sham," he refused to submit a PIP. ECF Nos. 16 ¶¶ 39-40; 20 ¶¶ 69, 78. Dr. Shetty resigned from the University effective May 31, 2012 and obtained a full-time and higher paying professor position in the Physical Therapy Department at the University of Saint Mary in Kansas effective June 1, 2012. ECF Nos. 16 ¶¶ 42-43; 20 ¶ 78.

## II. JURISDICTION

This Court has jurisdiction over the subject matter and parties because the claims at issue implicate federal questions that arise under the Civil Rights Act and the Family and Medical Leave Act. *See* 28 U.S.C. §§ 1331, 1343; *see also* 42 U.S.C. § 2000e-5(f)(3) ("Each United States district court . . . shall have jurisdiction of actions brought under this subchapter. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in

which the aggrieved person would have worked but for the alleged unlawful employment practice . . . ."). The University is located in Hampton, Virginia, within this division of the Eastern District of Virginia. *See* E.D. Va. Local Civil Rule 3(B)(2).

Dr. Shetty filed his original complaint on September 21, 2012, ECF No. 1. He subsequently filed an Amended Complaint on November 28, 2012, ECF No. 4, wherein he alleges four counts: (1) Title VII – Discrimination Based Upon National Origin; (2) Title VII Retaliation; (3) Interference with Right to Receive FMLA Leave; and (4) Retaliation for Seeking FMLA Leave.[3] After hearing argument of counsel and reviewing the briefs, the matter is now ripe for disposition.

## III. STANDARD OF REVIEW

Summary judgment under Fed. R. Civ. P. 56 is appropriate when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, finds there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). A court should grant summary judgment if the nonmoving party, after adequate time for discovery, has failed to establish the existence of an essential element of that party's case, on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To defeat a motion for summary judgment, the nonmoving party must go beyond the facts alleged in the pleadings, instead relying upon affidavits, depositions, or other evidence to show a genuine issue for trial. *See id.* at 324. Conclusory statements, without specific evidentiary support, are insufficient. *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998).

---

[3] In his brief in opposition to the University's Motion for Summary Judgment, Dr. Shetty "concedes summary judgment as to count IV – FMLA Retaliation." ECF No. 20 at 2.

Rather, "there must be evidence on which the jury could reasonably find for the [party]." *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

### A. Count I – Title VII Discrimination Based Upon National Origin

Dr. Shetty claims that the University, through its officers or agents, "illegally discriminated disparately against" him because of his East Indian national origin. ECF No. 4 at 11-14. Specifically, because of his national origin, Dr. Shetty claims he endured: denial of work accommodations and opportunities, acts of public humiliation and embarrassment, negative and derisive comments from faculty and students, and disparate treatment. *Id.* Count I of Dr. Shetty's First Amended Complaint is captioned "TITLE VII – DISCRIMINATION BASED UPON NATIONAL ORIGIN." During the hearing, and throughout the opposition brief, Dr. Shetty's counsel argued that Count I contains both hostile work environment and disparate treatment claims in violation of 42 U.S.C. § 2000e-2(a)(1). *See* ECF No. 20 at 23-27; *see also* Tr. at 46-47, ECF No. 34.[4] However, Dr. Shetty's claim "for disparate treatment based on [his national origin] is a separate and distinct claim from a claim of a hostile work environment, and cannot be transformed into a hostile work environment claim unless the facts alleged meet the separate criteria for a hostile work environment claim." *Bailey v. Int'l Paper*, No. 2:11-3013, 2012 WL 405719, *3 (D.S.C. Jan. 13, 2012) (citing *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims . . . are different in

---

[4] "The Court: Okay. Let's approach it this way. Count 1 of your amended complaint, what are you asserting a claim for? Is it [disparate] treatment, or is it hostile work environment? Mr. Walker: Your Honor, the evidence of hostile work environment, we do contend that a hostile work environment existed. It existed going back to 2009. The Court: Is that your claim? Mr. Walker: Yes, Your Honor. The Court: Okay. Because you understand or do you disagree that you can't have both a [disparate] treatment and a hostile work environment claim in one count? I mean, those are two separate claims. They have separate elements. They will have separate facts that are going to prove them. And so I am trying to get a handle on what Count 1 is articulating. Mr. Walker: I will be happy to amend the complaint and ask for leave from the Court to amend the complaint. I do believe there are common facts that establish hostile work environment and that establish [disparate] treatment." *Id.*

kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult."); *Kilby-Robb v. Spellings*, 522 F.Supp.2d 148, 164 (D.D.C. 2007) ("Alleged acts of disparate treatment cannot be transformed, without more, into a hostile work environment claim.")). When advised by the Court during the hearing that separate claims require separate counts in a complaint, Dr. Shetty's counsel more than once articulated his intention to seek leave of Court to amend his complaint again. Tr. at 46-47, 58, 76-77, ECF No. 34. Despite these assurances, the Court never received such a motion for leave to amend or a proposed amended complaint. Accordingly, the Court examines the First Amended Complaint to determine whether it sufficiently pleads, and there are material facts in dispute, to support either a hostile work environment or disparate treatment claim.

### 1. Hostile Work Environment under Title VII

"Because an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 354 (4th Cir. 2013) (internal quotation marks and citation omitted). The Court finds that standing alone, Dr. Shetty's Amended Complaint does not explicitly allege a hostile work environment claim, and because Dr. Shetty is represented by counsel, the Court is not required to liberally construe his pleadings, as it normally would with *pro se* parties. Viewing the evidence now before the Court in a light most favorable to Dr. Shetty, the Court finds that no reasonable jury could find for Dr. Shetty on a hostile work environment claim, even if such a claim were properly alleged in the complaint.

To survive the University's Motion for Summary Judgment, Dr. Shetty must set forth evidence on which a reasonable jury could rely to find the University created a hostile work environment, through its agents, by satisfying the following elements: (1) unwelcome conduct in

a work related setting; (2) complained of conduct was based on Dr. Shetty's national origin; (3) the conduct was severe or pervasive to alter his condition of employment and to create an abusive work environment; and (4) the conduct was imputable on some factual basis to the University. *Crockett*, 717 F.3d at 35 (citing *Spicer v. Commonwealth of Va., Dep't of Corr.*, 66 F.3d 705, 709-710 (4th Cir. 1995) (en banc) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993))). After a review of the evidence before the Court, the Court would find that there is no genuine issue of material fact as to the alleged hostile work environment claim, and that the University is entitled to judgment as a matter of law on this basis.

Simply stated, there are insufficient material facts before the Court to suggest that any of the actions taken by Dr. Williams, the alleged discriminating official,[5] were based on, or because of, Dr. Shetty's national origin. Dr. Shetty's First-Amended Complaint and Opposition to the Defendant's Motion for Summary Judgment are both replete with problems he experienced with Dr. Williams. These facts, however, do not seem to have anything to do with national origin harassment. They describe an environment where a new supervisor made assignments to Dr. Shetty with which he disagreed, and may have denied him certain "work accommodations and opportunities" to which he believed he was entitled, thereby resulting in a workplace dispute and, perhaps, some callous behavior by Dr. Williams. *See* ECF No. 4 at 11-14. Based on the evidence before the Court, it is clear that Dr. Williams and Dr. Shetty had a discordant relationship. Nonetheless, the proffered facts simply do not demonstrate "an abusive work environment" based on Dr. Shetty's national origin. *See Bass v. E.I. DuPont & Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). In support of his contention that Dr. Williams was motivated by discriminatory animus in her treatment of him, Dr. Shetty proffered two instances of

---

[5] As discussed *infra*, n.15, Dr. Shetty failed to name another discriminatory agent of the University, other than Dr. Williams.

discriminatory comments allegedly directed towards him by Dr. Williams. These allegations, which were omitted from the First-Amended Complaint and only disclosed in discovery, allegedly both occurred in 2009, which is outside the statutory timeframe, as discussed in the next section. Specifically, in his answer to Interrogatory Seven, Dr. Shetty claims that, in September of 2009, Dr. Williams compared him to an "Indian terrorist" or an "Asian Terrorist." In his deposition, Dr. Shetty explained further that Dr. Williams "told me I'm a threat to the campus, I look violent. And she said that 'It happened in the [sic] Virginia Tech, the Chinese guy did that, and you may be Indian doing it here." Shetty Dep. II at 80-83 ("She says, 'You look like a little Indian terrorist,' something like that.").[6] The other instance Dr. Shetty proffered is when Dr. Williams allegedly told him in April of 2009 that "she did not understand my language, she wanted me to take a speech pathology class and go back to India to teach because I don't speak good English." *Id.* at 79.

Even viewed in a light most favorable to Dr. Shetty, these remarks are isolated and not corroborated by any other evidence. "[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated[,] and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) (internal citation omitted). Standing alone, these derogatory comments do not prove that Dr. Williams acted because of Dr. Shetty's national origin. *Cf. EEOC v. Sunbelt Rentals, Inc.*, 531 F.3d 306, 315 (4th 2008) ("Title VII does not establish a 'general civility code for the American workplace . . . .'") (citing *Oncale*

---

[6] Apparently this incident occurred on September 28, 2009. The context of Dr. Shetty's deposition testimony reflects this conversation occurred when he was required to sit in Dr. Williams' office the day after she chastised him for purportedly missing a certain mandatory event. *See* Shetty Dep. II at 79-80, Ex. 15. Notably, the undated "Response and Complaint of Discrimination" which recounts Dr. Shetty's version of the aforementioned conversation in detail, fails to include any reference to Dr. Shetty being called a "terrorist" by Dr. Williams. *See* Shetty Dep. II Ex. 15, *passim.*

*v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (The "conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment.")).   Absent any showing that Dr. Williams' conduct was motivated by Dr. Shetty's national origin, he cannot maintain a cause of action for hostile work environment.

Therefore, to the extent Count I in Dr. Shetty's First-Amended Complaint can be construed as alleging a claim for hostile work environment, because there are no genuine issues of material fact in dispute, the undersigned recommends granting summary judgment in the University's favor.

### 2. Disparate Treatment under Title VII

Alternatively, Dr. Shetty alleges a claim for disparate treatment under Count I in violation of Title VII. ECF No. 4 at 11-14. Specifically, he claims that the University:

> unreasonably subjected the Plaintiff to unjust scrutiny, devoted solely to the Plaintiff and not applied to other employees of the Defendant.  The Defendant wrongfully denied travel stipends and benefits rightfully due to the Plaintiff as a tenured professor, while allowing other employees such benefits.  In conjunction, the Defendant subjected the Plaintiff to unjust scrutiny compared to other employees and attempted to change his job status unduly.  In or around April and May of 2010,[7] the Defendant, by its agent Dr. Williams, attempted to make the Plaintiff teach courses outside the physical therapy department.  No other faculty member was asked to teach in other departments.  By Defendant's harassment and disparate treatment, the Plaintiff was singled out and refused the benefits and necessary obligations of his employment.  As the only professor within the Physical Therapy department of East Indian national origin, the Defendant employed disparate treatment as a form of discrimination of Plaintiff and subjected him alone to harsher and unjust scrutiny.

*Id.* at 14.  Only discrete acts of discrimination or disparate treatment are properly before the Court, and therefore, Dr. Shetty must have filed a charge within three-hundred days of the date

---

[7] Although Dr. Shetty alleged these dates in his complaint, the undisputed evidence proffered in connection with this motion show that the Anatomy course was reassigned in the Fall of 2010 and the other courses in December 2010.

of the alleged discriminatory act, "or lose the ability to recover for it." 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 535 U.S. 101, 110 (2002).[8] Dr. Shetty filed his charge with the EEOC and the Virginia Council on Human Rights, the State agency, on April 29, 2011. ECF No. 1 Ex. 1 at 3-4. Accordingly, Dr. Shetty cannot recover for any alleged discrete discriminatory acts that occurred over three-hundred days prior to his filing; in other words, prior to July 3, 2010. *Accord Morgan*, 535 U.S. at 110. When analyzing Dr. Shetty's claims for disparate treatment, the Court only considers those acts that are alleged to have occurred within the appropriate statutory timeframe, July 3, 2010 and forward.

When direct evidence of discrimination based on national origin in violation of Title VII is not available, employees who allege discrimination must instead follow the burden-shifting pretext approach as established under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973). On summary judgment, the Court views the available evidence in a light most favorable to Dr. Shetty as the non-moving party, to determine whether there are any genuine issues of material fact in dispute, and whether the University is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Under *McDonnell Douglas*, to survive the University's Motion, Dr. Shetty must establish a *prima facie* case of national origin discrimination by providing evidence of the following elements upon which a reasonable jury could rely: (1) he is a member of a protected class; (2) who suffered adverse employment action; (3) while he performed his job duties at a level that met the employer's legitimate expectations at the time of the adverse employment action; and (4) similarly situated employees outside of the

---

[8] Title VII establishes two limitations periods within which a discrimination charge may be filed with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1). "The basic limitations period is 180 days after the alleged unlawful employment practice. However, the limitations period is extended to 300 days when state law proscribes the alleged employment practice and the charge has initially been filed with a state deferral agency." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (citing *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 439 (4th Cir. 1998)).

protected class received more favorable treatment. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (citing *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 252 (1981); *McDonnell Douglas*, 411 at 807)).

If Dr. Shetty establishes a *prima face* case, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Hill*, 354 F.3d at 285. If this burden is met, it shifts back once again to Dr. Shetty, who must then "prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). At this point, Dr. Shetty is faced with the "burden of persuading the court that the plaintiff has been the victim of intentional discrimination," *Burdine*, 450 U.S. at 256, which is the "ultimate question" of every employment discrimination case involving a claim of disparate treatment. *Hill*, 354 F.3d at 286. Specifically, to demonstrate this intent to discriminate, Dr. Shetty "must produce sufficient evidence upon which one could find that 'the protected trait . . . *actually motivated* the employer's decision." *Id.* (citing *Reeves*, 530 U.S. at 141) (emphasis added). In other words, Dr. Shetty's national origin "must have *actually played a role* in the employer's decisionmaking process and had a determinative influence on the outcome." *Id.* (emphasis added) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor J, concurring) (noting that "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the plaintiff's burden" of proving discrimination)) (additional citations omitted).

First, the Court finds that Dr. Shetty failed to set forth sufficient evidence to make out a *prima facie* case of disparate treatment because there is no evidence of an adverse employment action. Assuming that all other elements have been satisfied, the material facts to support Dr.

Shetty's claim simply do not rise to the level of an adverse employment action. Under Title VII, an "adverse employment action is a discriminatory act that 'adversely affects the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (citing *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). "The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action." *Id.* "There must be some significant detrimental effect and 'absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position.'" *Id.* (citing *Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999)).

At the hearing and throughout his brief in opposition, Dr. Shetty contends he suffered three adverse employment actions, all of which the Court finds either fails to constitute a cognizable adverse employment action or fails to rise to the level of having a significant detrimental effect on the terms and conditions of his employment: (1) his reduction from a twelve month employee to nine month employee, and thus, a lower salary; (2) his removal from two research courses, the kinesiology course, and the anatomy course; and (3) Dr. Williams' performance evaluation score of 49, which eventually led to the PTR and PIP. Tr. 48. First, the evidence shows that Dr. Shetty voluntarily made the decision to change his employment contract to nine-months, even after Dr. Hammond advised that it would result in lower pay. ECF No. 16 ¶ 10; Shetty Dep. II at 50-51; Hammond Dep. at 52. Dr. Shetty proffered no facts alleging his change in status was forced upon him, or even that it was suggested to him by the University. Moreover, Dr. Shetty elected to make this change in his status in May of 2010, prior to July 3,

15

2010 statutory timeframe limitations period. 42 U.S.C. § 2000e-5(e)(1). Therefore, the Court would find as a matter of law that Dr. Shetty's voluntary decision to change his employment contract from twelve months to nine months, after being counseled by Provost Hammond about the results of doing so, does not constitute an adverse employment action. *Cf. Hooper v. State of Maryland, Dep't of Human Res.*, 45 F.3d 426, at *5 (4th Cir. 1995) (unpublished per curiam) (finding that an employee's voluntary transfer to another office or another division was not an adverse employment action under Title VII).

Second, Dr. Williams' removal of Dr. Shetty from teaching the courses he previously taught, and her attempted reassignment to courses within the physical education department, fails to rise to the level of having a significant detrimental effect on the terms and conditions of Dr. Shetty's employment. "[R]eassignment to a new position commensurate with one's salary does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Boone*, 178 F.3d at 256-57 (finding reassignment of NASA electrical engineer from lab to wind tunnel did not constitute a tangible employment action under *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)). Accordingly, the Court would find as a matter of law that Dr. Williams' course reassignment does not constitute an adverse employment action.

Lastly, the poor performance evaluation by Dr. Williams that triggered PTR and PIP also fails to rise to the level of having a significant detrimental effect on the terms and conditions of Dr. Shetty's employment. "A 'downgrade of a performance evaluation *could* effect [sic] a term, condition, or benefit of employment' if it has a tangible effect on the terms or conditions or employment." *James*, 368 F.3d at 377 (citations omitted). "However, a poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to

detrimentally alter the terms or conditions of the recipient's employment." *Id.* (citations and internal quotations omitted). No term or condition of Dr. Shetty's employment changed as a result of the PTR process. Dr. Shetty was required to put together a dossier, which he did, and the PTR committee eventually recommended that he complete a PIP with the new department chair, which he refused to do. Nonetheless, the University did not alter his employment or penalize him. Dr. Shetty proffered no evidence that he suffered a diminution in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion, the typical requirements for a showing of an "adverse employment action" that can support a Title VII claim. *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981). Moreover, courts are hesitant to meddle in academic tenure review processes. *See Smith v. Univ. of North Carolina*, 632 F.2d 316, 345 (4th Cir. 1980) ("Tenure is one of the most difficult of all academic decisions . . . a privilege, an honor, a distinctive honor, which is not to be accorded to all . . . [which necessarily] involves a degree of subjectivity.") (citations omitted). Accordingly, because the poor performance evaluation did not detrimentally alter the terms or conditions of Dr. Shetty's employment, the Court finds that it did not rise to the level necessary to constitute an adverse employment action.

Nevertheless, even if the Court were to accept that Dr. Shetty set forth sufficient evidence to make a *prima facie* case of disparate treatment, and specifically, evidence that his removal from teaching certain classes and placement in the PTR process rose to the level of a material alteration of the terms and conditions of his employment, thus constituting adverse employment actions, under the *McDonnell Douglas* analysis the University met its burden of production by presenting evidence that showed "a legitimate, non-discriminatory reason for the adverse

employment action."[9] *Accord Hill*, 354 F.3d at 285. In other words, even if the Court were to find that Dr. Shetty met his initial burden and the burden of production then shifted to the University, the evidence before the Court shows that Dr. Williams had legitimate reasons wholly unrelated to Dr. Shetty's national origin to reassign his courses, and to give him a poor performance evaluation.

First, the undisputed evidence is that that it was routine for a department chair to change the course assignments of various professors. Williams Dep. at 20. It was also undisputed that Dr. Shetty was not qualified under CAPTE standards to teach Anatomy in the physical therapy program. Shetty Dep. I at 45; Shetty Dep. II at 48. Dr. Williams' legitimate, non-discriminatory reason for her attempted course reassignment was done on the basis of Dr. Shetty's doctorate in physical education, with a specialization in kinesiology, and exercise physiology. Williams Dep. at 114-117 ("Dr. Shetty is not a physical therapist nor a clinician. Therefore, he cannot teach evidence based practice to our students."). Hence, the Defendant has met its burden of production on this issue.

Second, the Defendant carried its burden of production by offering evidence of a legitimate, non-discriminatory reason for its decision to poorly evaluate Dr. Shetty and place him under PTR. On April 8, 2011 Dr. Williams provided a memorandum with documentation to Dean Dixon setting forth the justification for her Faculty Evaluation of Dr. Shetty. ECF No. 16, Ex. 19. Among other things, Dr. Shetty was the subject of numerous complaints from students and staff, his course syllabi were found "gross[ly] deficiencie[nt]" by CAPTE, he had not

---

[9] The University provided evidence to show that the University counseled Dr. Shetty as to the consequences of his decision to change from a twelve-month to a nine-month employee. *See* Shetty Dep. II at 50-51. Inasmuch as this decision was voluntary on Dr. Shetty's part, as discussed *supra*, his change in status cannot be considered an "action" of any kind, adverse or otherwise, taken by the employer. At most, the University permitted Dr. Shetty to change his status.

received grant funding, had not published books or articles, and his "actions and behaviors ... [were] found to have been disruptive to the learning environment and impeded the growth of the department." *Id.*   Even after a meeting with Dean Dixon and Dr. Shetty, Dr. Williams was steadfast in her belief that based on her observation, Dr. Shetty earned and deserved a poor performance evaluation score of 49. *See* ECF No. 16, Ex. 7 at 1 ("I met on March 17, 2011 with you and Dr. Bernadette Williams, Chair of the Department of Physical Therapy. . . . Dr. Williams was firm in her position that you had been fairly evaluated."). The PTR committee reviewed the documentation provided by Dr. Hammond and the student complaints and concurred in the evaluation. ECF Nos. 16 ¶¶ 31-32, Ex. 20; 20 ¶ 77. Accordingly, there is evidence before the Court showing a legitimate, non-discriminatory basis for the University's decision to place Dr. Shetty on PTR. Therefore, even if the Court were to accept that Dr. Shetty met his initial burden in setting forth a *prima facie* case of disparate treatment, the University satisfied its subsequent burden of demonstrating a legitimate, non-discriminatory basis for the employment action, and as such, the burden would shift back to Dr. Shetty to show evidence of pretext. *Accord Hill*, 354 F.3d at 286.

In this next step in the analysis, wherein Dr. Shetty must prove that the University's reasons for its actions were really a pretext for discrimination, the Court finds that Dr. Shetty's claim for disparate treatment fails because he did not establish material evidence that shows that the University's reasons were false and that his national origin *actually played a role* in Dr. William's decision-making process, and had a determinative influence on the outcome. *Id.* (citing *Reeves*, 530 U.S. at 141). In the first instance this Court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination . . . ." *DeJarnette v. Corning*, 133 F.3d 293, 299 (4th Cir. 1998)

(citing *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997) (quotations and citations omitted)).  It is not the Court's role to decide whether the University's reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for its actions. *Id.*  In analyzing the two employment actions at issue then, while Dr. Shetty may have disagreed with Dr. Williams' decision to reassign his classes, he has proffered no evidence that her reasons for doing so were false and merely a pretext for national origin discrimination.  As discussed *supra*, Dr. Shetty's assignment to teach courses in the physical education department was based on the fact that his doctorate was in physical education, and the fact that, given he was neither a physical therapist nor a clinician, he could no longer teach evidence based practice classes to students.  Williams Dep. at 114-117.  Dr. Shetty failed to produce material evidence demonstrating that this reason for his course reassignments was false or that the real reason was his national origin.

Additionally, as discussed *supra*, Dr. Shetty's poor 2010 performance evaluation was substantiated by documentation and justification provided by Dr. Williams in her April 8, 2011 memorandum to Dean Dixon.  ECF No. 16, Ex. 19.  While he obviously disagrees that he deserved such a rating, he did not proffer material evidence establishing that the bases on which Dr. Williams' relied for her evaluation were false.  In other words, he did not offer evidence that many students and staff did not complain about him, that his course syllabi were not found to be deficient by CAPTE, and that he had not received grant funding.  He does contest Dr. Williams' finding that he had published neither books nor journal articles, arguing that he had published an article in 2009 and was "working on" two books during 2009 and 2010 that were published in

2011, and therefore he should have received three more points on his evaluation.[10]  ECF No. 20,

¶¶ 62-64.  However, this Court does not sit as a "super-personnel department" to determine

whether Dr. Shetty should have received a "49," a "52" or some other score on his 2010

evaluation. *DeJarnette*, 133 F.3d at 299.  Whether or not Dr. Williams was mistaken for not

crediting Dr. Shetty in this regard, and whether or not her rating was "wise, fair or even correct,"

Dr. Shetty proffered no material evidence that Dr. Williams' explanation for her rating was false,

and that the real reason for the evaluation was discrimination based on Dr. Shetty's national

origin.

     In sum, there is no material evidence before the Court upon which a reasonable jury

could rely to find that Dr. Williams' actions as discussed above were not based on legitimate

reasons, but instead were a pretext for discrimination based on Dr. Shetty's national origin. *Id.*

Therefore, for these reasons, to the extent Count I in Dr. Shetty's First-Amended Complaint can

be construed as alleging a claim for disparate treatment, because there are no genuine issues of

material fact in dispute, the undersigned recommends granting summary judgment in the

University's favor as to Count I.

### B. Count II – Title VII Retaliation

     Dr. Shetty claims that the University retaliated in violation of Title VII after Dr. Shetty

engaged in various protected acts that challenged the University's alleged discriminatory

practices.  In other words, in Count II Dr. Shetty claims that the actions taken by the University

delineated in Count I were motivated not just by his national origin, but also, or alternatively,

taken in retaliation for his complaints of discrimination.  Under Title VII, it is unlawful "for an

---

[10] Dr. Shetty claims he provided the article to Dr. Williams. Shetty Dep. II at 122. Dr. Williams contends that Dr. Shetty did not show her the article. Williams Dep. at 107. Neither party explains the relevance of an article published in 2009 to the evaluation for matters Dr. Shetty was supposed to have accomplished in 2010.

employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). To prove a *prima facie* case of retaliation and survive the University's Motion, Dr. Shetty must set forth evidence upon which a reasonable jury could rely that (1) he engaged in protected activity; (2) the University acted adversely, or discriminated against him; and (3) the protected activity was causally connected to the adverse or discriminatory action. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) (citing *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)); *see also Wells v. Gates*, 336 F. App'x 378, 382-83 (4th Cir. July 10, 2009) (unpublished per curiam). In the absence of direct evidence, the same burden-shifting framework set forth in *McDonell Douglas Corp.*, as discussed in the previous section, applies. *Wells*, 336 F. App'x at 382 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)). Once the employee establishes a *prima facie* case of retaliation, the burden shifts to the employer to demonstrate a legitimate non-retaliatory reason for the action. *Id.* (citing *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006)). If demonstrated as legitimate, the employee must then show pretext. *Id.*

"To satisfy the second element, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Wells* at 383 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (internal quotation marks and citation omitted). This is unlike Title VII's substantive discrimination provision, which requires an "adverse employment action" against the employee, as discussed

*supra* in section IV.A.2. The anti-retaliation provision "extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington*, 548 U.S. at 64, 67 (discussing that in a retaliation claim, the employer's action against the employee "is not limited to discriminatory actions that affect the terms and conditions of employment."). Rather, "[t]he adverse action need not be an ultimate employment decision, but must be 'materially adverse,' meaning 'it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Prince-Garrison v. Maryland Dept. of Health and Mental Hygiene*, 317, F. App'x 351, 354 (4th Cir. Mar. 13, 2009) (unpublished per curiam) (citing *Burlington*, 548 U.S. at 68)). The harm suffered by the employee must be material, and not merely "trivial, [as] Title VII . . . does not set forth a general civility code for the American workplace." *Id.* (additional internal quotations and citations omitted). This objective standard is phrased "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington*, 548 U.S. at 69.

Finally, to establish the third element, i.e., that the protected activity was causally connected to the adverse or discriminatory action, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," not merely a motivating factor. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). In the absence of direct evidence that the employer acted with an illegal, retaliatory motive, which has not been provided here, a retaliatory motive may be inferred based on the temporal proximity between the employer's knowledge of the protected activity and the materially adverse employment action. *See, e.g., King v. Rumsfeld*, 328 F.3d 145, 151 & n. 5 (4th Cir. 2003), *cert. denied*, 540 U.S. 1073 (2003). However, as the Supreme Court has observed:

> The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of

causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close."

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing, with approval, cases holding that gaps of three and four months between protected activity and the adverse action did not support an inference of retaliation); *see also Shields v. Fed. Exp. Corp.*, 120 F. App'x 956, 963 (4th Cir. 2005) (finding a three to four month gap is insufficient to establish temporal proximity).

Here, again, the "protected acts" engaged in by Dr. Shetty, as alleged in the First Amended Complaint, and as substantiated by evidence in the record, are less than clear. Viewing the evidence in a light most favorable to Dr. Shetty, and in broadly construing the allegations in his complaint, the following is a timeline of the protected acts (in bold), i.e., making claims, or informing others, of discrimination,[11] and the subsequent University action that Dr. Shetty argues would have dissuaded a reasonable worker from engaging in the protected acts:

(1) **Between September 30, 2009 and October 19, 2009: Dr. Shetty complained to Dr. Hammond about Dr. Williams.** ECF No. 20 ¶¶ 36-37 (citing Shetty Dep. II at 82-84; Hammond Dep. at 21-22).

(2) **February 2010: Dr. Shetty met with Mr. Druitt, Assistant to the Dean, to complain of Dr. Williams' alleged discriminatory actions.** ECF Nos. 4 ¶¶ 33-34; 16 ¶ 9; 20 ¶ 41 (citing Shetty Dep. II at 49).

---

[11] "Protected activity under Title VII includes not only 'utilizing formal grievance procedures [but also] staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.'" *Norman v. City of Roanoke*, No. 7:04cv278, 2005 WL 1528415, at *4 (W.D. Va. June 22, 2005) (quoting *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)) (additional citation omitted).

**(3) May 2010: Dr. Shetty voluntarily requested from Dr. Hammond a reduced nine-month employment contract, which Dr. Shetty claims he requested due to the alleged discrimination by Dr. Williams**. ECF No. 16 ¶ 10; Shetty Dep. II at 50-51; Hammond Dep. at 52.[12]

a. Fall 2010: Dr. Williams removed Dr. Shetty from teaching Anatomy[13] class. ECF Nos. 16 ¶ 13.

b. December 2010: Dr. Williams removed Dr. Shetty from teaching Research I and II, and Kineisiology courses, and attempted to reassign him to teach courses in the Physical Education Department. ECF No. 20 ¶¶ 43-45.

c. December 10, 2010: Dr. Williams alleged that Dr. Shetty falsified information contained in his curriculum vitae ("CV") and recommended termination, although Dean Dixon and Dr. Hammond never acted on Dr. Williams' recommendation. ECF No. 20 ¶¶ 47-49, Ex. 23.

d. January 2011: Dr. Williams denied Dr. Shetty's request to travel to Atlanta for an American Heart Association convention, but this denial was subsequently reversed by Dean Dixon, who approved the travel request.[14] ECF Nos. 16 ¶ 15; 20 ¶ 50.

---

[12] In his deposition, Dr. Shetty claims Dr. Williams retaliated against him for his complaint to Dr. Hammond about Dr. Williams' use of grant money. *See* Shetty Dep. II at 132-35. However, this type of complaint does not satisfy the standard of a "protected activity" under Title VII. *See supra* n.11.

[13] While Dr. Shetty was removed from the Anatomy course he previously taught, he did not consider this to be an adverse employment action. In fact, he "was very happy" he was removed from teaching that course. Shetty Dep. II at 111 ("Q: So that's not part of your complaint?  A: No, no, anatomy is not part of the complaint, no."). Accordingly, the Court will not consider Dr. Shetty's removal from the Anatomy course in the retaliation analysis.

[14] Dr. Shetty also complains of a denied travel request from September 2009, wherein Dr. Williams denied his request to travel to James Madison University to attend a Physical Therapy event. ECF Nos. 16 ¶ 8; 20 ¶ 35. However, the first possible protected activity occurred subsequent to this request, when he met with Dr. Hammond.

e.  February 2011: Dr. Shetty received a "poor" evaluation score of 49 from Dr. Williams, which triggered the PTR process.  ECF Nos. 16 ¶¶ 16, 18; 20 ¶ 53.

**(4) March 3, 2011: Dr. Shetty filed an internal complaint by letter to Dean Dixon, regarding his poor performance evaluation and alleged discrimination by Dr. Williams.** ECF No. 16 ¶ 17; 20 Ex. 10.

**(5) April 29, 2011: Dr. Shetty filed a charge with the EEOC.** ECF No. 1 Ex. 1 at 3-4.

a.  June 30, 2011: Dean Dixon and Dr. Williams resign.  ECF No. 16 ¶¶ 22-23.

b.  Fall 2011: The PTR process continued, and in late September 2011, the committee initially recommended termination of the process.  ECF Nos. 16, Ex. 17 at 2; 20 ¶ 76.  This decision was rescinded in November 2011, and the committee recommended Dr. Shetty complete a PIP.  ECF Nos. 16 ¶¶ 31-32, Ex. 20; 20 ¶ 77.  Dr. Shetty subsequently refused to submit a PIP because he thought the PTR process was a complete "sham," which resulted in no action by the University.  ECF Nos. 16 ¶¶ 39-40; 20 ¶¶ 69, 78.

c.  May 30, 2012: Dr. Shetty resigned from the University and took a full-time job with University of Saint Mary in Kansas effective June 1, 2012.  ECF Nos. 16 ¶¶ 42-43; 20 ¶ 78.  Dr. Shetty claims this constitutes "constructive discharge."

The Court would find that based on the evidence in the record, Dr. Shetty fails to make a *prima facie* case of retaliation under Title VII.  Moreover, even if the Court were to assume Dr. Shetty did make such a showing, he again has failed to present material evidence of pretext that would sufficiently rebut the University's legitimate non-retaliatory reasons for the disputed action. Therefore, the University is entitled to judgment as a matter of law on Count II.

---

Therefore, this travel request denial could not form the basis for a retaliation claim because the protected act had not occurred yet.

### 1. Prima Facie Case of Retaliation under Title VII

Notably, the main substance of Dr. Shetty's retaliation claim chronologically occurred after he informed Mr. Druitt and Dr. Hammond about the alleged discrimination, but before he filed a formal grievance with Dean Dixon and before he filed the EEOC charge; in other words, the substance of the University's discriminatory acts alleged to constitute retaliation—removing him from physical therapy courses, recommending termination (but never taking any ultimate action) for falsification of his CV, denying (but subsequently approving) a travel request to Atlanta, and scoring his teaching performance as "poor"—allegedly occurred in retaliation for Dr. Shetty's complaints to Mr. Druitt and Dr. Hammond. *See supra* (3)(a) – (d).

Assuming Dr. Shetty can establish that he engaged in protected activity by complaining to the University—specifically, to Dr. Hammond in the fall of 2009, Mr. Druitt in February 2010, and Dr. Hammond again in May 2010—Dr. Shetty's *prima facie* retaliation claim fails because the Court cannot infer such a retaliatory motive by the University when there is neither direct evidence of retaliatory motive, nor temporal proximity between the protected activity and the adverse actions which could demonstrate a causal connection between the University's knowledge of the complaints and the materially adverse employment action. *See King*, 328 F.3d at 151 n. 5. The facts are in dispute as to whether the alleged discriminatory actor on behalf of the University, Dr. Williams,[15] knew of Dr. Shetty's complaints generally of national origin

---

[15] In various portions of Dr. Shetty's filings, Dr. Shetty mentions his objection to Dr. Hammond providing the PTR committee with Dr. Williams' basis for her poor performance evaluation, wherein the committee vacated its earlier decision to terminate the PTR process and instead implemented a PIP. However, Dr. Shetty never names Dr. Hammond as the retaliatory actor, and bases his claims of discrimination and retaliation solely against Dr. Williams as an agent for the University. *See* Shetty Dep. II at 142-43 ("Q: Is there any other individual at Hampton University that you're claiming had [discriminated or retaliated against you.] A: Not that I know of. Q: Dr. Williams is the person you claim is the one who was discriminating against - - A: Discriminating and retaliated against me. And also, initially, the school may have supported me for certain things, but when I went to the EEOC, the school was against me."). In his deposition, Dr. Shetty fails to specifically name another discriminatory actor on behalf of the University other than Dr. Williams.

discrimination, and there is scant evidence in the record that she knew specifically of Dr. Shetty's complaints to Dr. Hammond and Mr. Druitt.[16] Regardless, because the shortest temporal proximity between Dr. Shetty's protected activity and any adverse action by the University is at the very least six months, and because even a three to four month gap between the protected activity and the adverse action does not support an inference of retaliation, *see Clark Cnty. Sch. Dist.* 532 U.S. at 273-74, the Court would find that as a matter of law, Dr. Shetty has failed to proffer material facts to support his claim that his protected activity was a but-for cause of any materially adverse action taken by his employer. *Univ. of Texas Sw. Med. Ctr.*, 133 S. Ct. at 2534. Accordingly, Dr. Shetty's retaliation claim fails.

Viewing the evidence in a light most favorable to Dr. Shetty, there is a six month gap between Dr. Shetty's last complaint to Dr. Hammond in late May of 2010 and Dr. Shetty's removal from Research I, II, and Kinesiology in December of 2010. *See* ECF No. 20 ¶ 43 (citing Shetty Dep. II at 49-50; Williams Dep. at 116); *see also* Williams Dep. Ex. 20. There is also a six month gap between Dr. Shetty's complaints and Dr. Williams' letter to Dean Dixon on December 10, 2010 that recommends Dr. Shetty's termination for alleged falsification of information in his CV. *See* ECF No. 20 ¶¶ 47-49, Ex. 23. Moreover, there is an even larger temporal gap of eight and nine months, respectively, from Dr. Shetty's complaints, to Dr.

---

[16] During his deposition Dr. Shetty alleged he wrote a letter to Dr. Williams that documented his discrimination claims, and he "thinks" he gave it to her in October of 2009. Shetty Dep. II at 118, ECF No. 20, Ex. 8. Dr. Williams, on the other hand, steadfastly denied receiving the document or knowing anything about Dr. Shetty's initial complaints of discrimination in 2009 when questioned about this document. Williams Dep. at 79 (citing Ex. 13). While this fact is disputed, Dr. Shetty did not proffer evidence that Dr. Williams was aware of his complaints to Dr. Hammond or anyone else. Hearing Tr. at 73 ("The Court: Is there any issue about whether Dr. Williams was aware that Dr. Shetty had made these complaints to either Dr. Hammond or to Dr. Dixon or any of the other individuals that he reached out to? Mr. Walker: There is no direct evidence, Your Honor. The inference can be drawn from that October 1 e-mail and just common sense."). The e-mail referred to was actually from October 19, 2009, in which Dr. Williams advised Dr. Hammonds that "Dr. Shetty appears to be gathering information and documentation in preparation for something." Williams Dep. Ex. 15, ECF No. 16, Ex. 8 at 108-09. This statement hardly evidences knowledge on Dr. Williams' part that Dr. Shetty had complained of discrimination to Dr. Hammonds at that time.

Williams' initial denial of Dr. Shetty's request to travel to Atlanta in January of 2011 and Dr. Williams' poor performance evaluation of Dr. Shetty in February of 2011. As such, there is no material evidence before the Court showing a "very close" temporal proximity that would establish an inference of retaliatory motive and casual connection between Dr. Shetty's complaints to Mr. Druitt and Dr. Hammond, and Dr. Shetty's removal from Research I, II, and Kinesiology, the recommendation of termination letter from Dr. Williams, the initial denial of Dr. Shetty's travel request to Atlanta, and the poor performance evaluation by Dr. Williams. *Accord Clark Cnty. Sch. Dist.*, 532 U.S. at 273-74. Therefore, the Court would find that as a matter of law, Dr. Shetty's claim of retaliation for his complaints to Mr. Druitt and Dr. Hammond fails.

Next, Dr. Shetty claims the University retaliated against him for writing his formal grievance to Dean Dixon on March 3, 2011, and for filing an employment discrimination charge with the EEOC on April 29, 2011. Specifically, Dr. Shetty claims the University retaliated in the following ways: (1) in the fall of 2011, the PTR process continued and resulted in Dr. Shetty's required completion of a PIP,[17] and (2) on May 30, 2012, Dr. Shetty resigned, and claims he was constructively discharged by the University. First, the PTR process was automatically initiated in February 2011, before both Dr. Shetty's letter to Dean Dixon and his filing of the EEOC charge. The continuation and eventual completion of the PTR process cannot form the basis for a retaliatory action by the University when it started before Dr. Shetty engaged in the protected activity, and cannot be considered "intolerable." To the extent Dr. Shetty was displeased with Dr. Hammond's involvement in the PTR process by providing the committee with records supporting Dr. Williams' basis for the poor performance evaluation, Dr. Shetty does not claim

---

[17] Again, as discussed *supra*, Dr. Shetty fails to specifically name another discriminatory actor on behalf of the University other than Dr. Williams.

that Dr. Hammond was the University's retaliatory actor. *See supra* n.15. Second, there is no temporal proximity for Dr. Shetty's protected acts in the spring of 2011 and his eventual resignation *over a year later* on May 30, 2012. Therefore, there is also no causal connection between Dr. Shetty's protected acts in March and April, the PTR process and his resignation, and as a matter of law, his retaliation claim fails here as well.

Lastly, to the extent Dr. Shetty argues he was "constructively discharged," in that, while the University did not explicitly terminate him, his working conditions were so intolerable that a reasonable person would have been forced to quit, this theory fails too. The material facts are not in dispute: Dr. Williams, the alleged discriminating agent of the University, resigned in June of 2011, and it was not until almost a full year later that Dr. Shetty resigned in May of 2012. Dr. Shetty argues that by forcing him to endure PTR and the preparation of a PIP, he was "forced to quit" and thereby constructively discharged. Dr. Shetty's dissatisfaction with the PTR process, the resulting PIP, and what he construed as the "unfair criticism," is not enough to substantiate his claim of constructive discharge. *See generally, Pa. State Police v. Suders*, 542 U.S. 129 (2004); A*mirmokri v. Baltimore Gas and Elec. Co.*, 60 F.3d 1126 (4th Cir 1995). A prima facie case for retaliatory constructive discharge requires "something more" than actionable retaliation. *Suders*, 542 U.S. at 147; *Munday v. Waste Mgmt. of N. Am.*, 126 F.3d 239, 243 (4th Cir.1997) (retaliatory constructive discharge requires more than prima facie case of retaliatory adverse employment action). There is no evidence that suggests the University took any action, other than initiating the standard PTR process that occurs once a professor receives a low performance evaluation. Moreover, Dr. Shetty fails to set forth evidence that shows completion of the PIP would have been "so intolerable as to compel a reasonable person to resign." *Suders*, 542 U.S. at 147. Rather, Dr. Shetty's own perception and characterization of the process as a "sham"

resulted in his belief that he must resign. Accordingly, the Court would find his retaliation claim fails on this basis as well.

### 2. The University's Legitimate, Non-Retaliatory Response

Under the same burden-shifting framework use in section IV.A., even if the Court were to assume that Dr. Shetty could establish a *prima facie* case of retaliation, the University rebuts his claims with legitimate, non-retaliatory explanations. In other words, the actions taken by the University were not in retaliation for Dr. Shetty's protected activities, i.e., bringing alleged discriminatory practices to the attention of University leadership or filing discrimination charges. Rather, the University's actions at issue have legitimate, non-retaliatory rationale, all related to what was perceived to be deficient performance, and efforts designed to improve that performance.

Addressing each action by the University:[18] first, Dr. Williams testified as to non-discriminatory reasons for removing Dr. Shetty from physical therapy courses and attempting to reassign him to teach courses within the physical education department. *See supra* section IV.A.2 ("Dr. Shetty is not a physical therapist nor a clinician. Therefore, he cannot teach evidence based practice to our students."). Dr. Shetty fails to offer any evidence of pretext to rebut this legitimate reason from the University, and therefore, again, the University has met its burden of production. Moreover, Dr. Williams provided substantial justification for her Faculty Evaluation, *see* ECF No. 16, Ex. 19, and was steadfast in her poor performance evaluation of Dr. Shetty and the resulting PTR and PIP process, even after meeting with Dean Dixon and Dr. Shetty in response to Dr. Shetty's March 2011 letter. *See* ECF No. 16, Ex. 7 at 1. Finally, Dr. Williams discovered inconsistencies, and what she perceived to be falsifications, in Dr. Shetty's

---

[18] The Court will not address the University's initial denial of Dr. Shetty's travel request to Atlanta, because that denial was ultimately reversed by Dean Dixon and Dr. Shetty's travel request was approved.

CV during her preparation for the CAPTE visit, when she "reviewed curriculum vitas and related material of all faculty members in the Department of Physical Therapy." ECF No. 20, Ex. 23. In support of her recommendation of Dr. Shetty's termination, Dr. Williams cited the University's Faculty Handbook "Dismissal for Cause" section. *Id.* ("Faculty and instructional staff members, with our without tenure, may be dismissed by the Provost for cause. Cause includes . . . conduct unbecoming of a member of the University community including falsification of documents . . . ."). Dr. Shetty has failed to rebut the University's production of a non-retaliatory reason for the letter, and failed to proffer evidence that the real reason for the letter was retaliation for Dr. Shetty's complaints of discrimination. In any event, ultimately, the University Dean and Provost took no action on Dr. Williams' recommendation.

To conclude, even if Dr. Shetty satisfied his initial burden of proving a *prima facie* case of retaliation under Title VII, which he did not, the University proffered evidence of non-retaliatory, legitimate reasons for the actions it took, and Dr. Shetty has failed to demonstrate that those reasons were a pretext for retaliation. Again, while the evidence shows that Dr. Shetty and Dr. Williams had a problematic relationship, the evidence does not show that actions taken by the University were in retaliation for Dr. Shetty engaging in "protected acts." Therefore, for all of the above reasons, the Court finds that no genuine issue of material fact remains as Dr. Shetty's retaliation claim, and recommends that judgment be entered in the University's favor as to Count II.

### C. Count III – Interference with Right to Receive FMLA Leave

Dr. Shetty alleges that because he had a "serious health condition for which he was being treated regularly by a specialist in Neurology," he was "entitled to receive FMLA leave he requested," and the University "illegitimately prevented him from obtaining those benefits."

ECF No. 4 at 20-21.  Under FMLA, an eligible employee is "entitled to a total of 12 workweeks

of leave during any 12-month period for . . . a serious health condition that makes the employee

unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).

"It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the

attempt to exercise, any right provided under this title . . . ." *Id.* § 2615(a)(1).  As such, any

employer who violates this section shall be liable for damages in the amount of any wages,

salary, benefits or other compensation denied because of the violation, or where such benefits

have not been denied, any actual monetary losses sustained by the employee as a direct result of

the violation. *Id.* § 2617(a)(1)(A)(i).

      However, under FMLA, the "employee is mandated to provide notice to [his] employer

when [he] requires FMLA leave." *Rhoads v. FDIC*, 257 F.3d 373, 382 (4th Cir. 2001).  The

employee shall at least provide "verbal notice sufficient to make the employer aware that the

employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave."

*Id.* (citing 29 C.F.R. § 825.302(c)).  Likewise, it is within the employer's discretion "to require

that an employee's leave request 'be supported by a certification issued by the health care

provider of the . . . employee.'" *Id.* (citing 29 U.S.C. § 2613(a)).

      At the hearing, Plaintiff's counsel conceded that while the University ultimately denied

Dr. Shetty's FMLA leave request, Dr. Shetty was never penalized by the University when he

traveled to India anyway, and argued that the Dr. Shetty's "only damages are that change fee,"

because he allegedly had to change his flight.  Tr. 75.  The University did not dock Dr. Shetty

any pay, did not take away any benefits, and did not subject him to any other type of penalty for

taking the leave after his request was denied.  Accordingly, because "such benefits have not been

denied, [the only damages Dr. Shetty would technically be entitled to are] any actual monetary

losses sustained by the employee as a direct result of the violation." 29 U.S.C §
2617(a)(1)(A)(i). There is no evidence before the Court to support this claim for damages. The
only evidence before the Court is summarized as follows:

On December 2, 2011, Dr. Shetty filed a request for FMLA leave with the University to
travel to India for medical treatment. ECF Nos. 16 Ex. 5; 20 ¶ 79. This request was initially
approved by the new Department Chair, Dr. Williams' successor, Dr. Rainey. ECF Nos. 16 Ex.
5 at 2; 20 ¶ 81. However, after the University received certification from Dr. Shetty's healthcare
provider, the University's Director of Human Resources, Ms. Rikki Thomas, by letter dated
December 9, 2011, informed Dr. Shetty that he was not eligible for FMLA leave because the
certification did "not support the type of leave requested." *Id.* at 7. At this point, Dr. Shetty had
already left for India, and therefore his leave was unauthorized. ECF Nos. 16 ¶ 34; 20 ¶ 85;
Shetty Dep. II at 71. When Dr. Shetty returned in January of 2012, he lost no benefits and the
University did not take adverse action against him. ECF No. 16 ¶ 37; Shetty Dep. II at 70.
Accordingly, because there is no evidence before the Court as to the alleged "actual monetary
loss," the Court recommends that the University be granted judgment as a matter of law as to
Count III as well.

### D. Count IV – Retaliation for Seeking FMLA Leave

In his First Amended Complaint, pursuant to 29 U.S.C. § 2612(a)(1)(D), Dr. Shetty
alleges that the University retaliated against him for seeking FMLA leave by continuing him on
PTR and PIP. ECF No. 4 ¶¶ 84-87. However, both during his deposition, *see* Shetty Dep II. at
76, and in his opposition brief, *see* ECF No. 20 at 2, Dr. Shetty no longer claims that he was
continued on post-tenure review because he filed a claim for leave under FMLA. In order to
establish a *prima facie* case of retaliation under FMLA, similar to Title VII, Dr. Shetty must

prove: (1) he engaged in protected activity, i.e., the FMLA leave request; (2) the University took adverse action against him; and (3) there was a causal link between the protected activity and the adverse action. *Wright v. Sw. Airlines*, 319 F. App'x 232, 233 (4th Cir. Mar. 23, 2009) (unpublished per curiam) (citing *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004)). The evidence unambiguously shows that the University placed Dr. Shetty on PTR as early as February of 2011 after Dr. Williams gave him a poor performance evaluation of 49. Dr. Shetty did not request FMLA leave until December of 2011. Not surprisingly, because the alleged retaliation occurred ten months before the alleged protected FMLA leave request, Dr. Shetty no longer advances this claim. ECF No. 20 at 2 ("Dr. Shetty concedes summary judgment as to count IV – FMLA Retaliation."). Accordingly, the Court recommends that the University be granted judgment as a matter of law for Count IV.

## V. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that the University's Motion for Summary Judgment, ECF No. 15, be **GRANTED** and that Dr. Shetty's First-Amended Complaint, ECF No. 4, be **DISMISSED WITH PREJUDICE**, with judgment entered in favor of the University. Furthermore, the undersigned recommends that Defendant's Motion to amend its Answer, ECF Nos. No. 17, be **DISMISSED as MOOT**.

## VI. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of this Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d). A

party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

2. The Chief United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to all counsel of record.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia

January _3_, 2014

## CLERK'S MAILING CERTIFICATE

A copy of this Report and Recommendation was mailed on this date to the following:

Mr. Jonathan H. Walker
Mason Mason Walker & Hedrick PC
11848 Rock Landing Dr., Suite 201
Newport News, Virginia 23606
Counsel for the Plaintiff

Mr. Christopher M. Mackenzie
Jones Blechman Woltz & Kelly PC
701 Town Center Dr., Suite 800
Newport News, Virginia 23606
Counsel for the Defendant

　　　　　　　　　　　　　　　　Fernando Galindo
　　　　　　　　　　　　　　　　Clerk of the Court

By:

　　　　　　　　　　　　　　　　Deputy Clerk
　　　　　　　　　　　　　　　　January 3, 2014